**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| **RUBEN REYES, on his own behalf and all similarly situated individuals,** ) | |
| ) | |
| **Plaintiff,** ) | **CASE NO.  1:10-CIV-20837-COOKE/BANDSTRA** |
| ) | |
| **v.** ) | |
| ) | |
| **AT&T MOBILITY SERVICES, LLC,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO CONDITIONALLY
CERTIFY COLLECTIVE ACTION AND FACILITATE NOTICE TO POTENTIAL
CLASS MEMBERS**</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 2

    A.    Mobility's Indirect Distribution Channels ................................. 2

    B.    The Class Plaintiff Seeks to Certify Encompasses Three Distinct
    Jobs with Significant Differences in Job Duties. ......................... 3

        1.    Overall Responsibilities of RAEs, NRAEs and Hybrids .............. 4

        2.    Variations in Job Duties Depending on the Job, the Market,
        the Individual, and the Retailers They Support ........................... 4

            a.    The Significant Differences Between Working with
            Local Dealers and National Retailers ............................... 5

            b.    Other Differences Based on the Market and the
            Individual Account Executive ............................................ 9

    C.    The Named Plaintiff ................................................................ 16

    D.    The Status of these Job Classifications .................................. 17

ARGUMENT ...................................................................................................... 17

    I.    Legal Standard ................................................................................. 17

        A.    Conditional Certification is a Matter of the Court's Discretion. ............. 17

        B.    Plaintiff Bears the Burden of Demonstrating the Appropriateness
        of Conditional Certification. ..................................................... 18

        C.    The Administrative Exemption Involves A Detailed Factual
        Inquiry Into Each Employee's Actual Duties. ........................... 20

    II.    A Class Cannot Be Certified Because Plaintiff Has Failed to Meet His
    Burden of Showing that He Is Similarly Situated to Other Employees. .............. 22

        A.    This Misclassification Case Is Not Appropriate for Conditional
        Certification Because Each Individual Employee's Job Duties
        Must Be Scrutinized .................................................................. 23

        B.    The Inclusion of Three Different Jobs in the Proposed Class Makes
        Conditional Certification Inappropriate. ................................... 27

        C.    Significant Variations Among Employees' Day-to-Day Duties and
        Responsibilities across Markets Precludes Any Showing that They
        Are Similarly Situated ............................................................... 28

CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

Page

## Cases

*Aguirre v. SBC Commc'ns, Inc.*,
No. Civ.A. H-05-3198, 2006 WL 964554 (S.D. Tex. Apr. 11, 2006) ...................................... 26

*Amendola v. Bristol-Myers Squibb Co.*,
558 F. Supp. 2d 459 (S.D.N.Y. 2008) ..................................................................................... 21

*Anderson v. Cagle's Inc.*,
488 F.3d 945 (11th Cir. 2007) .................................................................................................. 19

*Bunyan v. Spectrum Brands, Inc.*,
No. 07-CV-0089, 2008 WL 2959932 (S.D. Ill. Jul. 31, 2008) ............................................... 26

*Cartner v. Hewitt Assocs., LLC*,
No. 6:09-CV-1293, 2010 WL 1380037 (M.D. Fla. Mar. 31, 2010) ........................................ 19

*Cohen v. Allied Steel Bldgs., Inc.*, 554 F. Supp. 2d 1331 (S.D. Fla. 2008) ............................ 19, 23

*Cooke v. Gen Dynamics Corp.*,
993 F. Supp. 56 (D. Conn. 1997) ............................................................................................. 25

*Diaz v. Elecs. Boutique of Am., Inc.*,
No. 04-CV-0840, 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ........................................... 32

*Dybach v. State of Fla. Dep't of Corrections*,
942 F.2d 1562 (11th Cir. 1991) ............................................................................................... 18

*Evancho v. Sanofi-Aventis U.S. Inc.*,
No. 07-2266 (MLC), 2007 WL 4546100 (D.N.J. Dec. 19, 2007) ........................................... 25

*Freeman v. Wal-Mart Stores, Inc.*,
256 F. Supp. 2d 941 (W.D. Ark. 2003) .................................................................................... 20

*Gonzales v. Hair Club for Men, Ltd., Inc.*,
No. 6:06-cv-1762, 2007 WL 1079291 (M.D. Fla. Apr. 9, 2007) ............................................ 20

*Grayson v. K Mart Corp.*,
79 F.3d 1086 (11th Cir. 1996) ............................................................................................ 20, 32

*H&R Block, Ltd. v. Housden*,
186 F.R.D. 399 (E.D. Tex. 1999) ............................................................................................. 24

*Haines v. S. Retailers, Inc.*,
939 F. Supp. 441 (E.D. Va. 1996) ........................................................................................... 27

*Haynes v. Singer Co.*,
696 F.2d 884 (11th Cir. 1983) ............................................................................................ 18, 19

*Haywood v. N. Am. Van Lines, Inc.*,
121 F.3d 1066 (7th Cir. 1997) .................................................................................................. 21

*Hipp v. Liberty Nat'l Life Ins. Co.*,
252 F.3d 1208 (11th Cir. 2001) ............................................................................................... 18

*Hoffer v. Ocwen Loan Servicing, Inc.*,
No. 08-81399-CIV, 2009 WL 1404696 (S.D. Fla. May 19, 2009) .......................................... 24

*Hoffman-La Roche, Inc. v. Sperling*,
493 U.S. 165, 110 S. Ct. 482 (1989) ........................................................................................ 17

*Holt v. Rite Aid Corp.*,
333 F. Supp. 2d 1265 (M.D. Ala. 2004) ...................................................................... 17, 22, 25, 27

*Kessler v. Lifesafer Serv. Providers, LLC*,
No. 6:06-cv-1442, 2007 WL 1531395 (M.D. Fla. May 25, 2007) .......................................... 20

## TABLE OF AUTHORITIES

**Page**

*King v. West Corp.*,
 No. 8:04CV318, 2006 WL 118577 (D. Neb. Jan. 13, 2006) ................................................. 26

*McAllister v. Transamerica Occidental Life Ins. Co.*,
 325 F.3d 997 (8th Cir. 2003) ........................................................................................... 21

*Mike v. Safeco Ins. Co. of Am.*,
 274 F. Supp. 2d 216 (D. Conn. 2003) ...................................................... 22, 24, 25, 26, 27, 28

*Morgan v. Family Dollar Stores, Inc.*,
 551 F.3d 1233 (11th Cir. 2008),
 *cert. denied*, 130 S. Ct. 59 (2009 ................................................................................. 18

*Morisky v. Pub. Serv. Elec. & Gas Co.*,
 111 F. Supp. 2d 493 (D. N.J. 2000) .............................................................................. 22, 25

*Reed v. Mobile County School Sys.*,
 246 F. Supp. 2d 1227 (S.D. Ala. 2003) ............................................................................ 29

*Reich v. John Alden Life Ins. Co.*,
 126 F.3d 1 (1st Cir. 1997) .......................................................................................... 21, 26

*Rodgers v. CVS Pharmacy, Inc.*,
 No. 8:05-CV-770T-27, 2006 WL 752831 (M.D. Fla. Mar. 23, 2006) ...................................... 29

*Scholtisek v. The Eldre Corp.*,
 229 F.R.D. 381 (W.D.N.Y. 2005) ................................................................................... 24

*Smith v. Heartland Auto. Servs., Inc.*,
 404 F. Supp. 2d 1144 (D. Minn. 2005) .............................................................................. 26

*Tyler v. Payless Shoe Source, Inc.*,
 no. 05-CV-33F(WO), 2005 WL 3133763 (M.D. Ala. Nov. 23, 2005) .................................... 29

*Ulysse v. Divosta Bldg. Corp.*,
 No. 06-80338-CIV, 2006 U.S. Dist. LEXIS 89414 (S.D. Fla. Dec. 7, 2006) ......................... 20

*White v. Osmose, Inc.*,
 204 F. Supp. 2d 1309 ................................................................................................. 19


## Statutes and Regulations

29 C.F.R. § 541.200(a)(2) .............................................................................................. 20, 26
29 C.F.R. § 541.202(b) .................................................................................................. 21, 26
29 C.F.R. § 541.700(a) ...................................................................................................... 25
29 C.F.R. §541.2 ............................................................................................................. 23
Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b) ............................................. 1, 17, 25, 30


## Other Authorities

DOL Opinion Letter, FLSA 2006-43, Nov. 27, 2006, at 1 (citing 29 C.F.R. § 541.2) ............... 21

Defendant AT&T Mobility Services, LLC ("Mobility"), by and through its attorneys, hereby submits its memorandum in opposition to Plaintiff's Motion to Conditionally Certify Collective Action (D.E. #74).

## INTRODUCTION

Plaintiff Ruben Reyes has not met, and cannot meet, his burden of demonstrating that he is "similarly situated" to all Retail Account Executives employed by Defendant AT&T Mobility Services, LLC (Mobility) across the United States, as required by the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b).  Plaintiff effectively admits this defect; his motion seeks conditional certification of a class comprised of "Retail Account Executives."  Pl.'s Mot. at 1. Yet Plaintiff appears ignorant of the fact that there are three separate jobs, with different job responsibilities and duties, implicated by the motion - Retail Account Executives ("RAEs"), serving the local dealer distribution channel, National Retail Account Executives ("NRAEs"), serving the national retail distribution channel, and account executives informally known as "hybrids," who work in both channels in some parts of the country.

The named plaintiff is not similarly situated to any definable class of employees, let alone a nationwide class of people who have worked in these three jobs.  The named plaintiff has never worked in the RAE job, has never worked as a hybrid, and has never worked with any local dealers.  Indeed, the named Plaintiff has only worked with one national retailer – RadioShack – in a portion of the Miami metropolitan area.  Plaintiff has no personal knowledge of the variations in how the RAE, NRAE or hybrid jobs are performed elsewhere in the South Florida market, let alone in other parts of the country.  The conclusory, cookie-cutter affidavits supporting the motion fail to establish that Plaintiff is similarly situated to the almost 1,000 other RAEs, NRAEs and hybrids across the country.  In fact, Plaintiff is not even similarly situated to the opt-ins, two of whom worked only with local dealers and three of whom worked in markets

1

outside of South Florida.  By contrast, the evidence submitted in support of this Opposition, including the declarations of more than eleven people who work in these three jobs across the country, illustrate significant differences among the jobs and even within each job, depending on the market.  Moreover, plaintiff's claim that he was improperly classified requires a detailed factual inquiry into his and any putative class member's individual job duties to determine whether each individual employee is properly classified under the administrative exemption.  Such individualized inquiries are inappropriate for class treatment.  Accordingly, conditional certification should be denied.

## STATEMENT OF FACTS

### A.    Mobility's Indirect Distribution Channels

Mobility is a leading provider of wireless communications in the United States, with approximately 90 million subscribers.  Chancellor Decl. ¶ 3.[1]  Mobility sells its products and services through various distribution channels, including via retail sales.  One retail distribution channel is comprised of approximately 2,000 company-owned retail (COR) stores nationwide. Peacock Decl. ¶ 3.  Separate from the COR channel, the company also sells its products and services indirectly, through independent dealer or agent stores (called the local dealer channel) and via non-exclusive relationships with large national retail chain stores (called the national retail channel).  *Id.*  The company's sales territories for direct and indirect sales channels are organized geographically into 5 regions and 27 markets within these regions.  Peacock Decl. ¶ 6; Chancellor Decl. ¶ 6.

---

[1] All declarations are cited by the declarant's last name and attached to the notice of filing in alphabetical order by the declarant's last name.

2

CASE NO.  1:10-cv-20837 MGC

The national retail channel is comprised of "big box" retailers, including RadioShack, Best Buy, and Wal-Mart, which have a presence in most markets across the country.  Chancellor Decl. ¶ 4.  The national retail channel operates in 50 states, Puerto Rico and Washington D.C. *Id.* ¶ 5.  National retailer contracts with Mobility are non-exclusive, which means the chains also sell competing telecommunications services such as Sprint or T-Mobile.  The local dealer channel also operates across the country.  Peacock Decl. ¶ 5.  However, local dealers, or agents, typically sell AT&T Mobility products and services on an exclusive basis.  Peacock Decl. ¶¶ 3, 12.  Mobility has approximately 3,300 local dealer locations (the majority of which are exclusive distribution; approximately 130 locations are non-exclusive distribution).  *Id.* ¶¶ 5, 12   Local dealers vary considerably in the size and scope of their operations.  Some are small "mom and pop" businesses that own and operate only one retail store, while others own and operate multiple locations in multiple markets.  *Id.*

**B.**     **The Class Plaintiff Seeks to Certify Encompasses Three Distinct Jobs with Significant Differences in Job Duties.**

Although Plaintiff frames his request as seeking conditional certification of a class comprised of a single "Retail Account Executive" job position, the class of employees Plaintiff seeks to represent is actually comprised of three different jobs.  While all three jobs are critical to the implementation of Mobility's business strategy and the success of its business in all markets, and while all three jobs meet the requirements of the FLSA's administrative exemption, there are significant differences among these three jobs, as well as within each job, depending on the market in which the RAE, NRAE or hybrid works.  *See* Peacock Decl. ¶¶ 7, 8; Chancellor Decl. ¶ 7.

CASE NO.  1:10-cv-20837 MGC

### 1.   Overall Responsibilities of RAEs, NRAEs and Hybrids

In the local dealer channel, RAEs function as account managers, with overall responsibility for helping local dealers exclusively distributing AT&T products and services to increase sales and achieve the highest level of customer satisfaction possible.  Peacock Decl. ¶ 8. In the national retail channel, NRAEs are responsible for managing their relationships at the national retailer locations they serve, by helping their locations promote AT&T sales over the sales of competing services and achieve the highest levels of customer satisfaction.  Chancellor Decl. ¶ 7; Vallejo ¶ 7.

In some markets, some or all of the NRAEs also service the local dealer channel and in other markets, some or all of the RAEs also help service the national retail channel.  Employees managing accounts in both distribution channels are informally called "hybrids" or "blended" account executives.  Peacock Decl. ¶ 9; Chancellor Decl. ¶ 8; *see, e.g.*, Berndt Decl. ¶ 2 (NRAE serving one local dealer account in addition to his cluster of 12 national retail stores); Combs Decl. ¶¶ 2, 3 (RAE serving local dealers as well as Wal-Mart, Costco and RadioShack stores). The decision on whether to use the hybrid approach is made by the leadership at the market level.  Chancellor Decl. ¶ 8; *compare* Maller Decl. ¶ 15 (South Florida used hybrids); Berndt Decl. ¶ 2, Pearson Decl. ¶ 7 (upstate New York hybrids); Combs Decl. ¶ 2 (most RAEs in Oregon have at least one national retail store in addition to their local dealers); *with* Tingwall Decl. ¶ 14 (North Florida does not use hybrids); Robbins Decl. ¶ 6 (Minnesota does not use hybrids); Boswell Decl. ¶ 3 (New York City does not use hybrids).

### 2.   Variations in Job Duties Depending on the Job, the Market, the Individual, and the Retailers They Support

Beyond these general responsibilities, there are several important differences in the job duties performed by RAEs, NRAEs and hybrids based on the job, the individual employee, the

market in which the employee works, and the type of indirect dealer(s) or retailer(s) he or she

supports.  In particular, significant differences exist between and among the three jobs

themselves since managing accounts in the local dealer channel is fundamentally different than

managing accounts in the national retail channel.

> **a.      The Significant Differences Between Working with Local Dealers and National Retailers**

The fundamental distinction between working in the local dealer channel and the national

retail channel is that the relationship between an RAE and a local dealer is significantly different

from the relationship between an NRAE and a national retailer, in part because the interests

between AT&T and the local dealer are aligned in a way that they are not with national retailers.

Vallejo Decl. ¶ 5; Maller Decl. ¶ 6 ("An RAE responsible for managing a local dealer/agent

relationship is a very different job from working with store managers at big box retailers.");

Combs Decl. ¶ 4 ("There is a significant difference between working with national retail doors

and local dealers.").

Local Dealers:  An RAE works closely with the owner of a business that exclusively sells

AT&T products.  Maller Decl. ¶ 6.  The RAE's relationship with the local dealer typically

consists of providing business advice on a variety of subjects.  Maller Decl. ¶ 7; Robbins Decl. ¶

9 (RAEs are often involved in working with local dealers on a variety of business strategy

matters, such as giving advice on particular sales strategies and optimizing staffing levels, to best

respond to customer traffic, and to take steps to increase the close rate); *see, e.g.,* Rietmann Decl.

¶¶ 4, 8 (regularly visits dealer's corporate offices and frequently make suggestions to store

managers on the stores' operations, such as on how to move older inventory and how to increase

business-to-business sales); Pearson Decl. ¶ 8-11 (gave advice about a procedural issue that

resulted in a $700 customer over-charge and helped another owner remarket her store and change

the way employees sell Mobility's products).  And, because the dealer is the owner, there is much more flexibility in how the operation can be run.  Maller Decl. ¶ 7; *see, e.g.,* Combs Decl. ¶¶ 4, 5 (more flexibility in customizing training for sales associates at local dealers than at national retailers).  "A successful RAE spends a considerable amount of time coaching the owner to understand and accept the ways of the AT&T world."  Maller Decl. ¶ 7.

Local dealers require more support from RAEs than a national retailer generally would in a variety of areas.  Robbins Decl. ¶ 7.  The RAE is required to have a detailed understanding of the dealer's business, including how the dealer incentivizes its employees through commission-based sales or otherwise.  *Id.*; Combs Decl. ¶ 22 (advises dealers on business issues and competitive pressures based on his analysis of their stores' numbers).  The RAE is also familiar with the terms of Mobility's contract with the dealers, key provisions of which help direct the RAE on how to prioritize his or her efforts.  Robbins Decl. ¶ 7.  Local dealers often want feedback and advice from the RAE about their sales associates' performance, what devices to purchase, merchandizing, new commercials, or how to allocate their advertising budget.  Combs Decl. ¶¶ 13, 16; Freund Decl. ¶ 5 (agents sought advice on how to spend their inventory dollars and how to allocate their advertising budgets); Rietmann Decl. ¶ 8 (spoke to store manager's supervisor with suggestions about how to improve manger's performance by shifting around her managerial responsibilities); Phelps Decl. ¶ 15 (plans promotional events with stores).

The management team in a particular market may decide to focus on distribution activity, to complete the build-out of dealers in a particular rural area.  Peacock Decl. ¶ 10.  In those situations, management will direct the RAE to make it a priority to scout out locations for new stores, and then work with his or her assigned local dealer to develop a strategy to expand operations at new locations.  *Id.*  Even if the RAE does not scout out the new location, the

dealers may seek the RAE's opinion about new locations they have chosen. *See, e.g.,* Combs Decl. ¶ 23. In addition, to successfully support small business sales, the RAEs work with local dealers by helping to develop small business presentations and going out with the dealer to close the business with small business owners. Admire Decl. ¶ 7.

<u>National Retailers</u>: By contrast, an NRAE typically works with a salaried department manager at a nationwide employer that sells all kinds of merchandise. Maller Decl. ¶ 6. NRAEs focus on selling the advantages of AT&T to the retailer to ensure they are promoting AT&T over the competing services the retailer may also sell. Combs Decl. ¶ 24; Freund Decl. ¶ 6 (to do this builds strong relationships with her accounts and ensures that store managers and associates see her frequently). The NRAE job is more challenging because NRAEs need to be better at building relationships with the store manager and the national retailer's sales employees and more creative in figuring out ways to increase sales with the tools available to them. Vallejo Decl. ¶¶ 6, 7 (NRAEs are like guests in someone else's house since each national retailer has its own rules of engagement that the NRAE has to follow); Gomez Decl. ¶ 13 (national retail channel presents an additional challenge since those sales reps do not exclusively sell Mobility products). In this competitive environment, training to ensure that sales associates at the national retailers know AT&T "backwards and forwards" so that they can sell Mobility's products is key. Freund Decl. ¶ 6.

- <u>Identity of Retailer(s) or Dealer(s)</u>:

Moreover, even within each channel, there are differences depending on the particular dealer or retailer the account executive supports. For example, on the local dealer side, two Illinois RAEs who work with Midwest Cellular, host weekly "move-the-middle" calls with Midwest Cellular's principal owner, an area or district manager, and sometimes Midwest's

CASE NO.  1:10-cv-20837 MGC

director of operations to discuss a weekly ranking report, strategies for meeting sales goals, and small business accounts.  Le Crone Decl. ¶ 6.  The RAE uses information from these calls to prepare checklists about what she needs to cover with the sales associates.  Le Crone Decl. ¶ 10.

On the national retail side, each big box retailer has its own culture, and an NRAE who works with stores operated by more than one such retailer will have additional challenges and responsibilities.  Chancellor Decl. ¶¶ 10, 12 (differences include the time allowed in store for store visits, training time allowed, varied levels of access to information by the retailer and varied level of engagement by retailer employees).  "Some retailers compensate on a commission or bonus structure and others pay associates hourly, and it is the NRAEs responsibility to determine how to best motivate and leverage their relationships to promote the sale of AT&T products and services."  *Id.*  The NRAE may maintain relationships with different levels of management, depending on the retailer.  For example, NRAEs may have relationships with district managers for their stores in addition to the store managers.  *See, e.g.,* Berndt Decl. ¶ 8 (speaks weekly with two district managers for his RadioShack stores; in recent conversation, one district manager asked him about store manager's performance and they discussed ideas of how to improve the store); Pearson Decl. ¶ 22 (RadioShack managers ask for his advice on driving sales and improving customer experience); Freund Decl. ¶ 17 (regularly gives feedback to store managers on associates and to district managers on store managers).

"A job limited to working with RadioShack stores can be limiting, in the sense that RadioShack has a very strong and different culture compared to some our other national retailer accounts."  Maller Decl. ¶ 13; Chancellor Decl. ¶ 11 (exclusive focus of RadioShack NRAEs in North Texas makes for a very different job compared to someone who works with several retailers).  Working with Wal-Mart stores, on the other hand, presents a very different set of

8

challenges and opportunities.  Maller Decl. ¶ 13; Vallejo Decl. ¶ 6 (Wal-Mart is more restrictive than other accounts in terms of the types of sales incentives that may be offered, requiring any incentive to benefit all employees in the store in the same way).  There is often not a specific manager who's responsible for Mobility's products and services at Wal-Mart.  By contrast, an NRAE assigned to RadioShack is attached to one of their District Managers.  *Id.*; Berndt Decl. ¶¶ 8, 10 (works closely with RadioShack store managers and district managers, strategizing about how to improve a store, assessing the performance of the store managers or sales associates and helping with special events).  The sales experience at Wal-Mart tends to be very different since it is a huge "big box" environment and employees are focused on many different things, and do not always think of Mobility's products as a priority.  Maller Decl. ¶ 13.  RadioShack, by contrast, "understands the importance of the wireless business; it is more of a priority to them."  *Id.* Consequently, it is more difficult to gain a share of the market in the environment NRAEs sometimes encounter at Wal-Mart.  *Id.* (lack of engagement can be an issue); Berndt Decl. ¶¶ 11-12 ("most important task" at Wal-Mart is to bargain for shelf space for Mobility's prepaid products, which often involves negotiating with the store manager or the zone merchandising manager to set up an "end cap" display at the end of an aisle).

**b.    Other Differences Based on the Market and the Individual Account Executive**

- The Hybrid Model:

The hybrid model of operations is a good example how market-level decisions affect the ways in which the RAEs or NRAEs perform their jobs.  Account executives who work in both channels have to be familiar with the different challenges and opportunities in both.  Chancellor Decl. ¶ 8; Maller Decl. ¶¶ 6, 8 (significant differences between local dealer channel and national retail channel makes it particularly challenging to be successful in a hybrid job).  A significant

number of account executives in both channels work as hybrids.  Chancellor Decl. ¶ 8; Peacock Decl. ¶ 9.

- Account Portfolios and Assignments:

In some markets, account executives are assigned to a geographic territory that may include retail outlets from more than one local dealer account or more than one national retailer account.  Peacock Decl. ¶ 11; Chancellor Decl. ¶ 10; *see, e.g.,* Phelps Decl. ¶ 4 (10 accounts, including six local dealers and four national retailers); Combs Decl. ¶ 3 (three local dealer accounts and three national retail accounts); Freund Decl. ¶ 2 (two accounts – RadioShack and Costco); Youngman Decl. ¶ 2 (three accounts – RadioShack, Wal-Mart, Best Buy).  By contrast, in other markets, account executives are assigned solely to stores operated by one local dealer or one retailer.  Peacock Decl. ¶ 11; Chancellor Decl. ¶ 10; *see, e.g.,* Le Crone Decl. ¶ 4 (works exclusively with the largest dealer in Illinois, Midwest Cellular); Taylor Decl. ¶ 4 (only one account – Spring Mobile, the largest local dealer in Colorado); Chancellor Decl. ¶ 11 (Retail Account Manager in North Texas and her team of seven NRAEs exclusively dedicated to RadioShack); Maller Decl. ¶ 10 (plaintiff exclusively worked with RadioShack).

- Numbers of Stores/Doors:

The number of retail outlets for which an account executive is responsible varies widely, ranging from approximately 9 to 25, with RAEs tending to serve fewer stores than NRAEs. Chancellor Decl. ¶ 14; Peacock Decl. ¶ 14; *see, e.g.,* Le Crone Decl. ¶ 4 (9 stores); Taylor Decl. ¶ 4 (12 stores); Berndt Decl. ¶ 2 (13 stores); Phelps Decl. ¶ 4 (16 stores); Andersen Decl. ¶ 5 (20 stores) Youngman Decl. ¶ 2 (21 stores); Combs Decl. ¶ 3 (23 stores).  The number of stores, also called doors, has a big impact on the way in which the RAEs and NRAEs work.  Chancellor Decl. ¶ 14; Peacock Decl. ¶ 14; Tingwall Decl. ¶ 17 (RAEs with fewer doors spend more time

10

with agent principals and owners).  In rural markets, for example, the distances between stores makes it impossible for the RAE or NRAE to have as many doors as is practical in a metropolitan or urban market.  Chancellor Decl. ¶ 14.  The challenges in rural markets include being able to get to each of the stores on a regular basis in order to maintain an effective presence.  *Id.*  By contrast, in metropolitan areas, RAEs and NRAEs may have as many as 20 doors, which presents its own set of challenges, including the need to be organized so that enough time can be spent with each store visit.  *Id.*  Thus, the frequency with which RAEs and NRAEs visit each of their stores varies depending on the type of market and the number of doors.  Taylor Decl. ¶ 8 (tries to visit all his stores every week); Le Crone Decl. ¶ 21 (visits stores every week and a half); Combs Decl. ¶ 19 (visits his stores about every other week); Rietmann Decl. ¶ 4 (six store visits a week).

- In or Out of the AT&T Wireline Footprint:

AT&T sells its wireline products and services at retail locations in various parts of the country.  Peacock Decl. ¶ 15.  One example is the U-Verse offering, which is a combination of high-speed internet, data and voice service distributed through AT&T's state of the art digital network.  *Id.*  U-Verse and other wireline products and services are available in all or portions of 22 states, in which AT&T provides traditional wireline telephone telephony.  *Id.*

Wireline products are sold primarily in the local dealer channel.  Maller Decl. ¶ 7.  Approximately 65 % of RAEs work in markets in which wireline products and services are available.  Peacock Decl. ¶ 15; *see, e.g.,* Le Crone Decl. ¶¶ 15-17.  Approximately 71% of NRAEs support at least one national retailer in markets where wireline products are available.  Chancellor Decl. ¶ 16.  Nevertheless, the wired piece of the business is a much more important part of the local dealer RAE (and hybrid) responsibility than the NRAE responsibility.

Chancellor Decl. ¶ 17; Maller Decl. ¶ 7 (NRAEs are no longer responsible for wireline sales in South Florida because national retailers were not prepared to sell these products and services with any consistency).  RAEs in the local dealer channel selling wireline products are compensated differently as their commission is based in part on wired sales.  Admire Decl. ¶ 8. By contrast, even where wireline products are available in national retail, NRAEs are not paid on sales of wireline services.  *Id.*; Tzanetakos Decl. ¶ 11 (wireline is not a big focus because his commissions are not impacted by these sales).

Account executives in wireline markets (particularly RAEs and hybrids) have to understand the additional products and services geared to a wired market, and how to support those products and services at their doors.  Admire Decl. ¶ 8 ("There is so much more that the RAEs need to know to be able to teach sales associates to include Broadband, Access Lines and TV products."); Le Crone Decl. ¶¶ 15-17 ("The addition of home solutions has added a lot of different, new metrics to chase and keep up with and has added another aspect of the business I have to make sure everyone is comfortable with."); Tingwall Decl. ¶ 15 (In Central Florida and part of North Florida where wireline products are sold, RAEs have 50/50 emphasis on wireline v. wireless; whereas in her part of North Florida market where almost no stores sell wireline, RAEs spend 99% of time on wireless).  In some markets, RAEs conduct focused wireline trainings and heavily emphasize wireline sales, while in other markets it is less of a priority.  Chancellor Decl. ¶ 17.

- Scheduling:

As managers, account executives set their own schedules and their approach to scheduling store visits varies.  Peacock Decl. ¶ 8; Chancellor Decl. ¶ 7; *see, e.g.,* Berndt Decl. ¶ 3 (looks at the sales performance of his stores and makes assessments based on the relevant

financial metrics affecting his compensation and that of the stores' managers and sales

representatives before planning where to "camp out and push for sales for the week"); Le Crone

Decl. ¶ 21 (plans her visits on a rotation, looking first at stores she missed the week before, with

changes to her initial plan precipitated by calls from a store with a particular issue, such as new

hires); Taylor Decl. ¶ 8 (often his schedule "will change on the spot" because he decides a store

needs more of his time or he is asked to accompany his local dealer's small business expert on

store visits); Phelps Decl. ¶ 8 (plans his store visits by selecting stores that are geographically

close to one another); Freund Decl. ¶ 9-10 (schedules her store visits based on training needs and

varies her hours to ensure she is able to work with part-time sales associates and to visit the

stores when they are busy).

- Approaches to Training and Coaching Sales Representatives:

Contrary to Plaintiff's conclusory claims, RAEs, NRAEs and hybrids do not simply

"relay the information that has been given to them in the required training programs" to their

accounts.  Pl.'s Mot. at 3.  Indeed, a "big part of [the RAE and NRAE] job is designing and

implementing training programs for sales associates at [their] sales locations."  Berndt Decl. ¶ 4;

Youngman Decl. ¶ 14 (develops his own agenda of what to train associates on).  While account

executives may be given reference documents, it is up to them to determine the best methods for

conveying this material to the sales associates at their stores.  Berndt Decl. ¶¶ 4, 5.  RAEs or

NRAEs may consider the following factors when deciding which training technique to use:  the

type of store, the nature of the product or feature at issue, specific competitive concerns, and the

talents, skill set and experience of the sales associates.  Berndt Decl. ¶¶ 5, 6; Youngman Decl. ¶

17 (works with veteran staff to try to get them to sell features like navigation that are not sold as

frequently).  In helping to launch Mobility's presence at RadioShack, NRAEs conducted a lot of

training for employees who had previously only sold competitor's service.  Pearson Decl. ¶ 18 (in charge of launch kick-off at seven RadioShack stores in his territory).

Account executives often customize training materials from Mobility's on-line learning library for a particular audience.  Berndt Decl. ¶ 6; Le Crone Decl. ¶ 14; Pearson Decl. ¶ 25. They may work together to prepare training materials or arrange a group training session.  *See, e.g.,* Freund Decl. ¶ 11 (two NRAEs in Illinois and Wisconsin work together to provide monthly training to the RadioShack managers in their doors); Vallejo Decl. ¶ 7 (her NRAEs try to "get buy-in from their doors to set up group training session").  To ensure the sales associates retain the material covered in previous trainings, one hybrid account executive organizes a series of quizzes and tests on those materials.  Pearson Decl. ¶ 16; Phelps Decl. ¶ 7 (opens and closes each training session with a review).  Some account executives use a tool called "step ahead" certification to measure how well sales associates perform under Mobility's 6 step sales experience.  Pearson Decl. ¶ 42.

An account executive's training strategies may differ depending on the preferences of the specific dealer or retailer.  For example, Michael Combs, an RAE in Medford, Oregon, uses role-play coaching during every visit to his Chat Cat stores, but only occasionally uses this technique at his other dealers' stores.  Combs Decl. ¶ 12.  The training needs also differ depending on which national retailer an NRAE supports.  For example, RadioShack sales associates are good with the technical side of the business, but many are not skilled salespeople; whereas Costco representatives are good at selling, but may not know as much on the technical side.  Combs Decl. ¶ 27; Pearson Decl. ¶ 27 (Wal-Mart associates present a special challenge because not as technically savvy as associates at RadioShack or Best Buy).  Another coaching tool, side-by-side

selling, is a useful training technique at RadioShack stores, but not at Best Buy, which restricts access to the customers.  Freund Decl. ¶ 8.

- _Authority to Issue (or Recommend) Customer Credits or Waive Activation Fees_:

Depending on the market, some RAEs, NRAEs and hybrids have authority to issue customer credits without prior approval, while others have authority to recommend customer credits, which have to be approved by the Area Retail Sales Manager or the Retail Account Manager.  Chancellor Decl. ¶ 13; _compare_ issue credits without approval: Combs Decl. ¶ 28, Freund Decl. ¶ 13, Pearson Decl. ¶ 30; _with_ recommend credits, usually approved: Berndt Decl. ¶ 18, Gomez Decl. ¶ 15, Phelps Decl. ¶ 13.  An example of an RAE exercising his authority to issue customer credits involved long-distance roaming charges in upstate New York near the Canadian border, where for a certain period of time, customers were having their cell phone signals picked up by towers in Canada and incorrectly charged for long distance roaming.  Jarrid Pearson authorized more than $10,000 in customer credits without prior approval to address the issue.  Pearson Decl. ¶ 30.  Another RAE uses her ability to issue customer credits to compensate customers when their rebates get rejected.  Le Crone Decl. ¶ 26.

Account executives in some markets may also have authority to waive activation fees without prior approval to help close a sale, as part of a promotion, to address customer complaints, or to move old inventory, while those in other markets may instead be able to recommend the waiver of activation fees.  Chancellor Decl. ¶ 13; Vallejo Decl. ¶ 8; _compare_ waive fees:  Le Crone Decl. ¶ 25; Tzanetakos Decl. ¶ 8; Freund Decl. ¶¶ 13, 15 (if store needs a boost, she authorizes free activations there for the weekend); _with_ recommend waiver:  Pearson Decl. ¶ 31.  Some RAEs also have authority to add rollover minutes to a customer's account in case the customer exceeds their plan minutes.  _See, e.g.,_ Combs Decl. ¶ 29.  Some NRAEs may

negotiate a payment plan with a customer, who exceeded their plan amount, to allow them to get current.[2]  Berndt Decl. ¶ 19.

- NRAE Involvement with NRFRs:

In some markets in the national retail channel, Mobility employs non-exempt employees called National Retail Field Representatives (NRFRs), who are managed in various ways. NRFRs are typically assigned to one retail location, where they perform a variety of tasks to help sales associates in that store increase sales.  Chancellor Decl. ¶ 9.  In some markets, the NRAE will be involved in observing the work of the NRFR, coaching, providing assignments, and coordinating their work.  *Id.*; *see, e.g.,* Combs Decl. ¶ 30 (has coaching relationship with NRFR that works with his doors; NRFR calls him for advice or help with customer issues); Pearson Decl. ¶ 33 (interviewed and recommended two individuals for NRFR job, both of whom were hired).  NRFRs do not work in the local dealer channel.

## C.    The Named Plaintiff

The named plaintiff, Ruben Reyes, is a former Mobility employee who was involuntarily terminated for falsification of company records (his employment application) in violation of AT&T's Code of Business Conduct.  Maller Decl. ¶ 9.[3]  During his employment, Plaintiff worked exclusively with one national retailer – RadioShack – in a portion of the Miami metropolitan area.  Maller Decl. ¶ 10.  He never worked with local dealers, or as a hybrid, or even with any national retailers other than RadioShack.  He never worked in any of the 26 markets outside of South Florida or in any of the other 49 states.

---

[2] In some markets, account executives have discretionary budgets for various types of promotional efforts to address market volatility and competitive issues.  Chancellor Decl. ¶ 13.

[3] Four of the five individuals who have filed opt-in consent forms are also former employees. Maller Decl. ¶ 11; Tingwall Decl. ¶ 5; Damiano ¶ 4; Robbins Decl. ¶ 5.

### D.      The Status of these Job Classifications

In May 2009, Mobility decided to reclassify the NRAE and RAE jobs from exempt to non-exempt.  Johnson Decl. ¶ 5.  Mobility announced that decision by email on May 4, 2009. *See* Ex. 1 to Decl. of Pl. Ruben Reyes.  In response, senior sales management in various parts of the country provided feedback urging that more analysis should be done before moving forward to implement the proposed reclassification.  Johnson Decl. ¶ 6.  In particular, sales operations management expressed a strongly-held belief that employees working in both of these jobs routinely exercise independent judgment and discretion in carrying out their local duties as managers of their dealer and/or national retailer accounts.  *Id.*

In response to this feedback, a team led by Curt Johnson, Director of Compensation, decided to look more closely at the issue.  Johnson Decl. ¶¶ 2, 7.  Johnson's team reviewed the information available to them about the actual job duties performed by individuals in these positions and also consulted with outside counsel.  *Id.* ¶ 7.  Based on that review, Johnson's team concluded that both jobs were in fact properly classified as exempt under the administrative exemption to the FLSA.  *Id.*  Johnson's team therefore recommended to senior management that the jobs not be reclassified and that recommendation was adopted.  *Id.* ¶ 8.

## ARGUMENT

### I.      Legal Standard

### A.      Conditional Certification is a Matter of the Court's Discretion.

The FLSA allows an individual to assert claims on behalf of himself and any "similarly situated" employees, but does not expressly provide for conditional certification or judicially approved notice to putative class members.  *See* 29 U.S.C. § 216(b).  Nevertheless, district courts "have discretion, in appropriate cases, to implement" the FLSA's collective action mechanism "by facilitating notice to potential plaintiffs."  *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165,

169, 110 S. Ct. 482 (1989).  Appropriate cases are those that involve "common issues of law and fact arising from the same alleged discriminatory activity," such that resolution of the common issues in one proceeding would promote efficiency and judicial economy.  *Hoffman-La Roche*, 493 U.S. at 170; *see also Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1268 (M.D. Ala. 2004) ("The power to authorize notice must, however, be exercised with discretion and only in appropriate cases.").

District courts in the Eleventh Circuit typically use a two-tiered approach in determining whether to certify a collective action under the FLSA.  *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001).  Under this approach, at the initial "notice" stage, the district court decides whether to conditionally certify a class based on the pleadings and any affidavits submitted.  *Hipp*, 252 F.3d at 1218.  Even at the notice stage, a district court may only conditionally certify a class where it is satisfied that that there are other employees who both (1) "desire to opt in," and (2) are "similarly situated" to the named plaintiff.  *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008), *cert. denied*, 130 S. Ct. 59 (2009).

**B.     Plaintiff Bears the Burden of Demonstrating the Appropriateness of Conditional Certification.**

Plaintiff has the burden of demonstrating that the case should be conditionally certified and that notice should be provided to other employees.  *Haynes v. Singer Co.*, 696 F.2d 884, 887 (11th Cir. 1983) (plaintiffs have the burden of showing "a reasonable basis for crediting their assertions that aggrieved individuals existed in the broad class they proposed").  In particular, plaintiffs must demonstrate "commonality between the basis of their claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions." *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002).  "Otherwise, it is doubtful

18

that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Anderson v. Cagle's Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (internal citations and quotations omitted).  "Although this burden is low and can often be met by detailed allegations supported by affidavits, it is *not invisible and cannot be based on the conclusory allegations of a few employees*." *Cartner v. Hewitt Assocs., LLC*, No. 6:09-CV-1293, 2010 WL 1380037, at *3 (M.D. Fla. Mar. 31, 2010) (emphasis added) (internal quotations and citations omitted) (denying certification where plaintiffs failed to offer single affidavit from any similarly situated employee working in any other location and there were significant differences even among named plaintiffs).  Rather, plaintiffs must make the requisite showing with competent evidence; neither unsupported assertions nor conclusory allegations will suffice. *Haynes*, 696 F.2d at 887.  Courts in the Southern and Middle Districts of Florida have routinely denied conditional certification where plaintiffs seek to certify a broad class based upon the conclusory affidavits of a few employees.  *See, e.g., Cohen v. Allied Steel Bldgs., Inc.*, 554 F. Supp. 2d 1331, 1334-35 (S.D. Fla. 2008) (attempt to certify a class based on terse affidavits that failed to even give a job description).[4]

Moreover, where the defendant presents affidavits, the plaintiff's allegations of class-wide discrimination must "successfully engage defendants' affidavits to the contrary." *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996).  Indeed, where the party opposing

---

[4] *See also Gonzales v. Hair Club for Men, Ltd., Inc.*, No. 6:06-cv-1762, 2007 WL 1079291, at *3-4 (M.D. Fla. Apr. 9, 2007) (attempt to certify a conditional class of stylists in 47 stores nationwide based only on affidavits of two local employees); *Kessler v. Lifesafer Serv. Providers, LLC*, No. 6:06-cv-1442, 2007 WL 1531395, at *1-3 (M.D. Fla. May 25, 2007) (attempt to certify class based only on conclusory allegations); *Ulysse v. Divosta Bldg. Corp.*, No. 06-80338-CIV, 2006 U.S. Dist. LEXIS 89414, at *3-4 (S.D. Fla. Dec. 7, 2006) (attempt to certify broad class of employees, based on one affidavit containing hearsay and second-hand knowledge).

conditional certification presents evidence refuting or undermining the plaintiff's allegations, district courts often conduct a more thorough examination of the plaintiff's allegations as part of the conditional certification analysis.  *See, e.g., Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003) (analyzing the parties' evidence at the conditional certification stage:  "It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated.").

### C.   The Administrative Exemption Involves A Detailed Factual Inquiry Into Each Employee's Actual Duties.

To meet the administrative exemption, an employee must (1) be compensated on a salary basis at a rate of at least $455 per week; and have a primary duty that (2) consists of the performance of office or non-manual work that is directly related to the management or general business operations of the employer or the employer's customers and (3) includes the exercise of discretion and independent judgment with respect to matters of significance.[5]  29 C.F.R. §

---

[5] It is worth noting that RAEs, NRAEs, and hybrids qualify as administratively exempt, and courts have denied motions for conditional certification where, as here, it is clear the employees are exempt.  *See Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 466 (S.D.N.Y. 2008) (inappropriate to authorize notice of collective action to other employees where employees were exempt under the administrative exemption).  First, Mobility's account executives are paid on a salary basis.  Chancellor Decl. ¶ 7; Peacock Decl. ¶ 8.  Second, their primary duties involve the performance of office or non-manual work that is directly related to the general business operations of Mobility and its customers and includes the exercise of discretion and independent judgment with respect to matters of significance.  Specifically, as account managers, RAEs, NRAEs and hybrids are critical to the success of Mobility's business with responsibility for increasing sales and achieving the highest level of customer satisfaction at the stores they serve.  Chancellor Decl. ¶ 7; Peacock Decl. ¶ 8.  In tailoring training content and techniques to meet the specific needs of their stores' sales associates, setting their own daily schedules, planning promotional events, and determining how to help stores increase sales, among other things, RAEs, NRAEs and hybrids exercise independent judgment and discretion with respect to matters of significance.  *See, e.g.,* Berndt Decl. ¶¶ 4-6, Youngman Decl. ¶¶ 14, 18 (training); Berndt Decl. ¶ 3, Le Crone Decl. ¶ 21, Freund Decl. ¶¶ 9-10, Phelps Decl. ¶ 8, Rietmann Decl. ¶ 4

(continued…)

541.200(a). The U.S. Department of Labor has emphasized that "the applicability of the administrative employee exemption depends not on occupational title, job classification, or position description, but rather an *individual employee's duties* and salary." DOL Opinion Letter, FLSA 2006-43, Nov. 27, 2006, at 1 (citing 29 C.F.R. § 541.2) (emphasis added). Moreover, determining whether a particular employee's primary duty involves the exercise of independent judgment "must be applied in light of all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). Due to the individualized inquiry involved in determining whether an employee qualifies as exempt, courts often deny conditional certification of misclassification claims. *See Holt*, 333 F. Supp. 2d at 1271-75 (denying conditional certification of allegedly misclassified store managers and assistant managers); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003) (denying conditional certification of allegedly misclassified insurance claims representatives).

---

(…continued)

(scheduling); Pearson Decl. ¶ 37, Phelps Decl. ¶ 15 (promotional events); Pearson Decl. ¶ 22, Le Crone Decl. ¶ 6 (advising stores on increasing sales). Moreover, in the local dealer channel, RAEs regularly advise entrepreneurs that exclusively sell Mobility's products on business strategies, competitive pressures and operations issues. *See, e.g.,* Pearson Decl. ¶ 8-10; Combs Decl. ¶ 22, Rietmann Decl. ¶ 8. While employees working in all three jobs are properly classified as exempt under the administrative exemption, Plaintiff's claim on the merits with respect to RAEs and hybrids is particularly weak. *See McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 998, 1001 (8th Cir. 2003) (claims coordinator who trained and coached other examiners and processed claims by following claims manual, but also exercising her own judgment was exempt administrative employee); *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 3-5, 12 (1st Cir. 1997) (applying administrative exemption to marketing representatives who dealt with licensed independent insurance agents who, in turn, dealt with purchasers of insurance products); *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1067-68 (7th Cir. 1997) (finding customer service coordinator for shipping company to be an exempt administrative employee and holding that resolving customer complaints and disputes about billing requires the exercise of discretion and independent judgment).

**II.      A Class Cannot Be Certified Because Plaintiff Has Failed to Meet His Burden of Showing that He Is Similarly Situated to Other Employees.**

The named plaintiff must establish that he is "similarly situated" to the proposed class, such that he is an adequate representative.  *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 495, 496, 498 (D. N.J. 2000) (denying motion to conditionally certify class where named plaintiffs were not similarly situated to opt-in plaintiffs, who held variety of positions and performed wide variety of job duties); *Cohen*, 554 F. Supp. 2d at 1334 (plaintiff "must establish that the putative 'opt-in' employees are 'similarly situated' to him in their job descriptions and claims alleged").  Here, Plaintiff attempts to satisfy this burden by describing his duties in broad and superficial terms such as "training," "relay information," "track and report the production (sales)," "store visits," and "merchandise" in an attempt to create an impression of uniformity between himself, the opt-ins and the putative class members.  *See, e.g.,* Pl.'s Ex. C, Reyes ¶¶ 11-15.  Indeed, the affidavits of the named plaintiff and the opt-ins are cookie-cutter copies of one another, changing only their names, dates of employment and for the two opt-ins whose employment ended prior to May 2009, omitting the paragraphs addressing the May 2009 reclassification notice (though the May 2009 notice is inexplicably still attached as an exhibit to these affidavits).  *See* Pl.'s Ex. C & D.  Yet, plaintiff only has personal knowledge of a portion of Mobility's operations in the Miami area of the South Florida market.[6]  Plaintiff, who worked exclusively in the national retail channel with RadioShack stores only, and only in the Miami metropolitan area, has no personal knowledge of the RAE or hybrid jobs, even in Miami, let alone the rest of Florida or elsewhere in the country.  Nor does he have any knowledge of the job

---

[6] As set forth in Mobility's Motion to Strike, to the extent plaintiff or the opt-ins purport to make statements about the job duties of other RAEs or NRAEs, such statements should be disregarded. *See Mike*, 274 F. Supp. 2d at 219, n.4.

duties performed by other NRAEs supporting different or multiple retailers, in Miami or elsewhere.  The opt-in affidavits are similarly defective.  Such boilerplate, conclusory allegations are insufficient to satisfy the plaintiff's burden of showing that he is similarly situated to other employees in the proposed class.  *See Cohen*, 554 F. Supp. 2d at 1334 (nearly identical declarations of plaintiff and an opt-in, which were limited to their knowledge of defendant's operations in one county and lacked any factual allegations establishing how plaintiff was similarly situated with other employees, failed even the lenient standard for conditional certification); *H&R Block, Ltd. v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999) (denying notice because plaintiffs failed to offer anything more than conclusory affidavits); *Hoffer v. Ocwen Loan Servicing, Inc.*, No. 08-81399-CIV, 2009 WL 1404696, at *2 (S.D. Fla. May 19, 2009) (speculative, general statements that others had complained about the practices challenged in the lawsuit, which sounded like "lawyer speak," were insufficient).

A.  **This Misclassification Case Is Not Appropriate for Conditional Certification Because Each Individual Employee's Job Duties Must Be Scrutinized.**

The nature of the allegations affects the analysis.  In a misclassification case challenging the application of an exemption, resolving the plaintiff's claim often involves applying the eligibility test for the exemption to the particular facts and circumstances of the plaintiff's employment.  *Scholtisek v. The Eldre Corp.*, 229 F.R.D. 381, 389 (W.D.N.Y. 2005) ("In [misclassification] cases, the purported class members' *job duties, and any dissimilarities* among them, will often be *relevant to whether the employees are similarly situated* for purposes of the FLSA, insofar as their job duties relate to whether they were correctly classified as exempt from the FLSA's overtime requirements.") (emphasis added).  Such cases are not suited to proceed as a collective action because their outcome hinges on "individual, fact-specific analysis of each employee's job responsibilities."  *Holt*, 333 F. Supp. 2d at 1271-72 (internal citations and

23

quotations omitted); *Morisky*, 111 F. Supp. 2d at 498 (focus is not on the defendant's actions,[7]

but rather on the employee's job duties in the context of the relevant exemption criteria); *Cooke*

*v. Gen Dynamics Corp.*, 993 F. Supp. 56, 60-61 (D. Conn. 1997) (the analysis of the

administrative exemption is "necessarily fact intensive," "turn[ing] on a careful factual analysis

of the full range of the employee's job duties and responsibilities").

  While the court need not reach the merits of the exemption issue at the conditional

certification stage, differences between employees' job responsibilities and duties will often

defeat certification in an exemption case.  *See. e.g., Evancho v. Sanofi-Aventis U.S. Inc.*, No. 07-

2266 (MLC), 2007 WL 4546100, at *3-4 (D.N.J. Dec. 19, 2007) (denying motion for conditional

certification of class of sales representatives); *Holt*, 333 F. Supp. 2d at 1271-72 (denying

plaintiff's motion to conditionally certify a class of store managers and assistant managers who

challenged their classification as exempt under the executive exemption by "arguing that as a

matter of fact, rather than formal job description, they [were] performing non-managerial duties

for the majority of their working hours");[8] *see also Mike*, 274 F. Supp. 2d at 220 (declining to

conditionally certify a class of insurance claims representatives who had been classified as

_____

[7] Even if the RAEs and NRAEs had been reclassified as non-exempt in May 2009, which they were not, that would not change the required analysis.  Regardless of how Mobility classified RAEs and NRAEs, the exempt status of each individual account executive depends upon an analysis of the employee's job duties, not the employer's classification decision.  *See* 29 C.F.R. §541.2; *Mike*, 274 F. Supp. 2d at 220 (reclassification did not provide "the necessary common thread" to establish that employees were similarly situated because the merits of plaintiff's claim turned on evidence of his day-to-day tasks, not upon any company policy or decision).

[8] Moreover, even if plaintiff had attempted to rely on formal job descriptions, such descriptions alone are not adequate proof that employees are similarly situated to qualify for conditional certification.  *See Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1151 (D. Minn. 2005); *Bunyan v. Spectrum Brands, Inc.*, No. 07-CV-0089, 2008 WL 2959932, at *7 (S.D. Ill. Jul. 31, 2008); *King v. West Corp.*, No. 8:04CV318, 2006 WL 118577, at *14 (D. Neb. Jan. 13, 2006) (employees with same job title and "essentially the same job description" were not similarly situated where their day-to-day job duties varied).

exempt under the administrative exemption, where the plaintiff claimed that the majority of the

daily job duties that he actually performed were non-administrative); *Reich v. Homier Distrib.*

*Co., Inc.*, 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005) (denying motion to proceed as

collective action where application of loader exemption required individualized, fact-specific

inquiry into amount of time each employee spent exercising discretion to safely load

merchandise); *Aguirre v. SBC Commc'ns, Inc.*, No. Civ.A. H-05-3198, 2006 WL 964554, at *7-8

(S.D. Tex. Apr. 11, 2006) (denying motion for conditional certification where plaintiffs failed to

"even make a minimal showing that all coach leaders perform the same type of work or exercise

the same amount of discretion" and evidence presented by the defendant showed that coach

leaders' duties varied).  In such cases, where the proof is "specific to the individual" employee,

the plaintiff cannot provide "evidence of a common thread binding his proposed class of

employees."  *Mike*, 274 F. Supp. 2d at 220-21.  Thus, regardless of whether another employee's

primary duties might be the same as the plaintiff, "any other plaintiff would also have to present

specific evidence of his or her daily tasks, and the court would have to apply the regulations on

an individual basis."  *Id.* at 221 (finding that plaintiff had failed to meet his burden to certify a

collective action class under the FLSA because "to determine membership in the class [plaintiff]

identifies . . . the court would have to engage in an ad hoc inquiry for each proposed plaintiff to

determine whether his or her job responsibilities were similar to [the plaintiff's]").

　　　Like the plaintiffs in these other misclassification cases, adjudicating the claims of the

Plaintiff and any opt-ins would require an individualized analysis of each employee's job duties

to determine what each employee actually does day-to-day and what level of discretion he or she

exercises.  Specifically, if a collective action class were certified, the Court would need to make

the following determinations to adjudicate the FLSA claims of each purported member:

- The job duties actually performed by each individual on a daily basis.  *Holt*, 333 F. Supp. 2d at 1271-72; *Haines v. S. Retailers, Inc.*, 939 F. Supp. 441, 447 (E.D. Va. 1996) (the "focus necessarily must be on what 'activities or duties the employee *actually* performs'") (emphasis in original).

- The amount of time each individual spent performing each of his or her daily tasks.  *Mike*, 274 F. Supp. 2d at 220-21.

- The importance of each duty performed by each employee.  29 C.F.R. § 541.700(a).

- Whether and to what extent each individual's job duties involved the performance of work related to the management or general business of Mobility or Mobility's customers.  29 C.F.R. § 541.200(a)(2).

- Whether and to what extent the individual's job duties involved the exercise of discretion and independent judgment "in light of all the facts involved in the particular employment situation."  29 C.F.R. § 541.200(a)(3), 29 C.F.R. § 541.202(b).

The determination of whether Plaintiff or any other class member is administratively exempt necessarily involves a detailed individualized inquiry into each employee's actual daily duties.  The proposed class encompasses three separate jobs, with significantly different job duties, across 27 markets and 50 states.  Accordingly, Plaintiff, who worked in only one metropolitan area of the South Florida market with only one national retailer, cannot show that he is similarly situated to RAEs, hybrids, or even other NRAEs, or to account executives working in the other 26 markets and 49 states, and conditional certification should therefore be denied.  In sum, there is no basis for the broad class proposed; the only remotely conceivable

26

class would be limited to NRAEs working with RadioShack in the national retail channel in the South Florida market.

**B.     The Inclusion of Three Different Jobs in the Proposed Class Makes Conditional Certification Inappropriate.**

Courts recognize that including different jobs within the proposed class may preclude a plaintiff that held only one of the jobs from being similarly situated with employees in the proposed class.  *See Reed v. Mobile County School Sys.*, 246 F. Supp. 2d 1227, 1232 (S.D. Ala. 2003) (denying conditional certification where the proposed class consisted of multiple jobs "with significantly different job duties and work schedules" and without a "showing that [plaintiffs] and the members of the proposed class are similarly situated with respect to job title or the attributes encompassed within that factor"); *Rodgers v. CVS Pharmacy, Inc.*, No. 8:05-CV-770T-27, 2006 WL 752831, at *1, 5-6 (M.D. Fla. Mar. 23, 2006) (denying motion to conditionally certify class consisting of five different jobs since plaintiff failed to show employees were similarly situated); *Tyler v. Payless Shoe Source, Inc.*, no. 05-CV-33F(WO), 2005 WL 3133763, at *4-7 (M.D. Ala. Nov. 23, 2005) (denying motion to conditionally certify class of store managers and store manager trainees because they were not similarly situated).

The substantial differences between and among the RAE, NRAE and hybrid jobs preclude any showing that employees working in these disparate jobs are similarly situated. RAEs work in an entirely different distribution channel than NRAEs; whereas hybrids work in both channels.  As explained in the many of the declarations submitted in opposition to the motion, including the declarations of Michael Combs, a hybrid RAE who works in both channels, Diane Freund, an NRAE who previously worked in the local dealer channel, and Karla Gomez, an RAE, there are significant differences between working with local dealers and national retailers.  *See supra* § Facts (B)(2)(a), at 4-9; *see also* Combs Decl. ¶¶ 4, 13, 16, 22-24;

Freund Decl. ¶¶ 5, 6; Gomez Decl. ¶ 13; Admire Decl. ¶¶ 7, 8. These differences directly impact the nature of the job duties the RAE, NRAE or hybrid performs on daily basis. *See supra* § Facts (B)(2)(a), at 4-9; *see, e.g.,* Combs Decl. ¶¶ 13, 16, 23; Freund Decl. ¶ 5 (advising local dealers on what devices to purchase, how to allocate advertising budget, new locations for stores); Berndt Decl. ¶ 11 (bargaining for shelf space at national retailer Wal-Mart for Mobility's prepaid products and negotiating with the store manager or the zone merchandising manager to set up an "end cap" display at the end of an aisle). The differences between and among the three jobs alone preclude Plaintiff from meeting his burden of showing that the employees in the class he proposes are similarly situated. Plaintiff, who worked exclusively with RadioShack in South Florida is clearly not similarly situated to RAEs or hybrids working with local dealers or even other NRAEs working with retailers other than RadioShack. Indeed, plaintiff is not even similarly situated to the opt-ins, two of whom worked in the local dealer channel. Robbins Decl. ¶ 4; Tingwall Decl. ¶ 3.

### C.   Significant Variations Among Employees' Day-to-Day Duties and Responsibilities across Markets Precludes Any Showing that They Are Similarly Situated.

Plaintiff seeks to certify a nationwide class based on boilerplate, conclusory allegations about his and the other opt-ins' job duties when collectively they worked in only four of the relevant 27 markets and three of the 50 states. Such an attempt ignores the myriad of differences that exist within each of the three jobs as a result of the numerous decisions that are made at the market or local level. *See supra* § Facts (B)(2)(b), at 9-15; *see, e.g.,* Chancellor Decl. ¶ 10 (market level management decides whether NRAE is assigned to a territory with stores from more than one national retailer or only works with the stores of one national retailer); Chancellor Decl. ¶ 13 (market level management decides whether NRAE can issue customer credits or waive activation fees without prior approval, or control a discretionary budget for promotional

activities to address market volatility and competitive issues); Peacock Decl. ¶ 10 (market level management may decide to focus on distribution activity and direct RAE to prioritize scouting new locations for local dealer stores).  Likewise, yet another market level difference influencing the job duties RAEs perform is that in 22 of the 50 states where RAEs work, AT&T sells wireline products and services, like the U-Verse offering, a combination of high-speed internet, data and voice services distributed through AT&T's digital network.  In these states, RAEs and hybrids have to understand and support the sales of these additional products, which alters the way the job is performed in these markets as compared to the 28 non-wireline states.  Peacock Decl. ¶ 15; Admire Decl. ¶ 8 ("I truly believe that it is a different job to sell wired products."); Le Crone Decl. ¶ 15-17;  *see also supra* § Facts (B)(2)(b), at 11-12.

Indeed, the unfounded, conclusory assumption of Plaintiff and the opt-ins that other RAEs "did the same thing" is contradicted by the declarations of other RAEs and NRAEs detailing the different ways in which individuals perform and carry out their jobs and the market-level or even local differences in the authority they have to use certain tools.  Such differences include:  authority to grant or recommend customer credits or waive activation fees (Combs Decl. ¶ 28, Freund Decl. ¶¶ 13, 15, Pearson Decl. ¶ 30, Le Crone Decl. ¶ 26, Berndt Decl. ¶ 18, Gomez Decl. ¶ 15, Phelps Decl. ¶ 15, Pearson Decl. ¶31; *see also supra* § Facts (B)(2)(b), at 15-16); scheduling issues such as the number of store visits per day and per week and their approach to those visits (Berndt Decl. ¶ 3, Le Crone Decl. ¶ 21, Taylor Decl. ¶ 8, Freund Decl. ¶¶ 9-10, Phelps Decl. ¶ 8, Combs Decl. ¶ 19, Rietmann Decl. ¶ 4; *see also supra* § Facts (B)(2)(b), at 10-11, 12-13); training and coaching techniques (Berndt Decl. ¶¶ 4-6, Youngman Decl. ¶¶ 6, 14, 18, Le Crone Decl. ¶14, Pearson Decl. ¶¶ 16, 25, 27, Taylor Decl. ¶ 9, Phelps Decl. ¶ 7, Combs Decl. ¶¶ 12, 27, Freund Decl. ¶¶ 8, 11; *see also supra* § Facts (B)(2)(b), at 13-15); involvement

with coaching or supervising NRFRs (Combs Decl. ¶ 30, Pearson Decl. ¶ 33; *see also supra* §

Facts (B)(2)(b), at 16); planning promotional events (Phelps Decl. ¶ 15, Pearson Decl. ¶ 37).

Thus, in addition to the inadequacy of Plaintiff's conclusory allegations on their face to establish

that he is similarly situated to RAEs, hybrids, or even other NRAEs, his affidavit and those of the

opt-ins further fail to "successfully engage defendants' affidavits to the contrary." *Grayson*, 79

F.3d at 1097.

In sum, the numerous differences in job duties within each job in Mobility's 27 markets

and innumerable local retail outlets across the country preclude Plaintiff from establishing that

he is similarly situated to other employees within the RAE, NRAE, or hybrid jobs. *See Diaz v.

Elecs. Boutique of Am., Inc.*, No. 04-CV-0840, 2005 WL 2654270, at *4 (W.D.N.Y. Oct. 17,

2005) (plaintiffs could not show store managers were similarly situated where their duties varied

from location to location).

## CONCLUSION

Because of Plaintiff's failure to meet his burden of demonstrating that there is a class of

Mobility's RAEs, NRAEs and/or hybrids to which he is "similarly situated" under the FLSA, 29

U.S.C. § 216(b), Mobility respectfully requests that the Court deny Plaintiff's motion to

conditionally certify a collective action and facilitate notice to potential class members.

CASE NO.  1:10-cv-20837 MGC

Respectfully submitted,

Daniel F. Blonsky, Florida Bar No. 972169
dblonsky@coffeyburlington.com
Benjamin H. Brodsky, Florida Bar No. 73748
bbrodsky@coffeyburlington.com
COFFEY BURLINGTON
2699 South Bayshore Drive
Penthouse
Miami, Florida 33133
Tel:  305-858-2900
Fax:  305-858-5261

and

Thomas P. Gies, Florida Bar No. 337242
tgies@crowell.com
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
Telephone:     (202) 624-2500
Facsimile:     (202) 628-5116

*Attorneys for Defendant AT&T Mobility, LLC*

By:  s/Daniel F. Blonsky

31

CASE NO.  1:10-cv-20837 MGC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 30, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the Mailing Information for CASE NO. 1:10-CV-20837 MGC.  Counsel of record currently identified on the Mailing Information list to receive e-mail notices for this case are served via Notices of Electronic Filing generated by CM/ECF.  Counsel of record who are not on the Mailing Information list to receive e-mail notices for this case have been served via U.S. Mail.

*s/*Daniel F. Blonsky

074931\0000309\12570313.5

32